STATE, Plaintiff, vs. ADERMAN, Defendant.

*June 3—June 28, 1955.*

For the plaintiff there was a brief and oral argument by *Harlan B. Rogers,* special counsel for the Board of State Bar Commissioners.

For the defendant there was a brief and oral argument by *David Rabinovitz* of Sheboygan.

PER CURIAM. Defendant, during some of the time involved, was also a licensed real-estate broker. The first count of the complaint charges misconduct in connection with a transaction had by him in 1949 with one Joseph Kugler. Kugler was seventy-five years old. He could neither read nor write English and his ability to understand the language was limited. His adopted daughter, Betty, could read and write English, and usually acted for her father in his business transactions. She lived with him.

Kugler owned two pieces of property and in 1949 decided to sell one of them. Betty saw an advertisement of the Adams Realty Company in a Milwaukee newspaper and called the company on the telephone asking that a representative call at their home. The defendant was the principal owner and conducted the affairs of the realty company. An employee of the company, Mrs. Dutcher, called at the Kugler home and secured a listing for the sale of the property for the sum of $10,000 plus a commission of $500. A Mr. Dietrich, another employee of the company, attempted to sell the property but was able to obtain only a tentative offer of $9,000. Dietrich prevailed upon defendant to purchase the property and a plan was devised by means of which the property might be bought without investing any money.

On October 5, 1949, the defendant and another salesman called upon Kugler and discussed with him the matter of buying the property. Kugler refused to negotiate in the ab-

sence of his daughter. Aderman then suggested that Kugler and the daughter call at his office. A day or two later the Kuglers called at Aderman's office at which time a purchase price of $8,000 was agreed upon. Aderman executed an offer to purchase the property for $8,000 and suggested to Kugler that he take it home with him. On October 10th the Kuglers returned to Aderman's office with the abstract of title at which time Kugler signed the offer to purchase and Aderman gave him a check for $100 as a down payment as provided in the offer of purchase. Thereupon Aderman arranged with one Stephen Fehirwary for a first-mortgage loan on the property. He had Kugler execute a deed of the property to Dietrich, Dietrich execute to Fehirwary a $4,000 mortgage, and then a deed from Dietrich and his wife, subject to the mortgage, to Kugler. A land contract was then executed naming Kugler as vendor and the defendant as vendee. A closing statement was prepared by Aderman which, after deducting certain items properly chargeable to Kugler, left a balance of $3,259.86 of the proceeds of the Fehirway mortgage which amount defendant paid to Kugler.

The Kuglers testified that they thought that by the transactions above described the $4,000, less the deductions, was to be considered as a down payment for the purchase of the property and that the balance of $4,000 was to be represented by a first mortgage payable at the rate of $35 per month and bearing interest at the rate of $5\frac{1}{2}$ per cent per annum. Betty Kugler, however, discloses by her testimony that she was not at all times under that impression and that during some of the time at least she understood fully the nature of the transaction. The defendant later sold the property for $9,200 after having made some improvements thereon. The referee found that the $8,000 paid by the defendant to Kugler was a fair price for the property.

The referee found that the defendant did not deal fairly with Kugler, although he said also that there is no doubt in

his mind that defendant intended to fulfil the terms of the land contract.

In Count Two of the complaint herein it is alleged that the defendant had been indicted in the United States district court for the Eastern district of Wisconsin upon two counts. The first count of the indictment charged that on and between October 30, 1927, and December 8, 1947, the defendant with other persons conspired to cause the North Avenue Savings & Loan Association of Milwaukee to make and use a false certificate for the purpose of inducing the Veterans Administration to guarantee a loan to one Grunert, a veteran. The second count of the indictment charged that he and another did on December 8, 1947, cause the North Avenue Savings & Loan Association to make and use a false certificate for the purpose of inducing the Veterans Administration to guarantee a loan to Grunert. Defendant was tried in the district court for the Eastern district of Wisconsin and found guilty of both offenses, each a felony. Judgment of conviction was entered on April 23, 1951. Defendant was sentenced to pay a fine of $5,000 and placed on probation for two years. He appealed to the court of appeals for the Seventh circuit where the conviction was affirmed. Certiorari was denied by the supreme court of the United States and when the cause was remanded to the trial court the original sentence was reduced to $1,000 and the probation period was reduced to one year.

In 1947 one Pritzkow decided to sell a home owned by him in the city of Milwaukee. He listed the property for sale with the Adams Realty Company, the defendant's company, for the price of $10,500. After listing the property Mrs. Pritzkow learned that the house could not be sold to an ex-service man if an F. H. A. loan were desired for an amount in excess of the price established by the F. H. A. office. The Pritzkows made application to the F. H. A. to establish such price. They were dissatisfied with the price first established

and with the assistance of the defendant and one of his saleswomen made a second application for price establishment. On September 17th they secured from the F. H. A. an established price, $10,195.50, which sum included a broker's commission of $485.50. One John Grunert was employed at the same place as Pritzkow who learned that the former was looking for a house. He was referred by Pritzkow to the defendant's company. On October 21, 1947, defendant prepared an offer by Grunert to buy the Pritzkow house and personal property then therein for $10,195.50. Grunert made a down payment of $100. The offer was accepted by the Pritzkows. All of the personal property which was later offered for sale separately was at that time in the house. Grunert's offer to purchase was made contingent upon his ability to obtain a G. I. loan and the defendant advised him to make application therefor.

A G. I. appraisal was made and the value of the house fixed thereby at $9,150. Defendant then notified Mrs. Pritzkow by telephone that $9,150 was the maximum amount that Grunert could pay for the property if he were to finance the deal by means of a G. I. loan. Defendant asked Mrs. Pritzkow if she and her husband would sell the personal property separately for enough to make up the balance of the purchase price and was informed by Mrs. Pritzkow that they would not. As a result of this telephone call a meeting was held at the defendant's office on the evening of November 5, 1947, which was attended by the defendant, one of his salesladies, the Grunerts, the Pritzkows, and Louis Potter, an attorney, the father of Mrs. Pritzkow. At that meeting defendant had the Grunerts sign a new offer to purchase the real estate for $9,150. The offer was accepted by the Pritzkows. A separate offer to buy the personal property for $1,045 was prepared by the defendant, signed by the Grunerts, and accepted by the Pritzkows.

On November 27, 1947, the parties met again at the defendant's office. The following papers were executed: A warranty deed from the Pritzkows to the Grunerts, a note and first mortgage in the sum of $8,150 executed by the Grunerts to the North Avenue Savings & Loan Association, a note for $1,045 secured by a chattel mortgage, a second note for $1,045 secured by a second mortgage on the real estate, and a bill of sale for the personal property. The bill of sale and chattel mortgage, which along with the other papers had previously been prepared by the defendant, were altered before execution by changing in longhand the description of some of the personal property. The change was suggested by Potter. It was arranged that the parties should meet on the following afternoon at the North Avenue Savings & Loan Association to close the deal.

They met at the office of the association on November 28, 1947, and transacted their business at that place with a Miss Clark, the secretary of the association. She asked what the sale price was to be and was told that it was $9,150. She obtained from the defendant the figures for the closing of the transaction. The note and first mortgage were delivered to Miss Clark. A certificate to the Veterans Administration required to secure a guaranty of the loan was signed by John Grunert. Two notes each for $1,045, the chattel mortgage, and the second real-estate mortgage were turned over by the defendant to Mrs. Pritzkow, who also received the association's draft for $8,150. Defendant received a check for $485 as his real-estate commission.

The existence of the chattel mortgage and the second mortgage was not disclosed by anyone to Miss Clark. The information contained in a certificate which was required to obtain the guaranty of the Veterans Administration was supplied by Aderman and in reliance thereon the loan was guaranteed by the Veterans Administration on December 15, 1947.

In March, 1949, Grunert was advised by the Veterans Administration that the chattel mortgage and the second mortgage were invalid as they represented an excess payment for the property. He refused to make any further payments upon the mortgage and defaulted.

As was stated by the circuit court of appeals in *United States v. Aderman* (7th Cir.), 191 Fed. (2d) 980, Aderman was found in the district court to have engaged as a participant in a plan to evade the requirements of the Servicemen's Readjustment Act and that as a part of that plan he and his conspirators had made a false and fraudulent certificate for the purpose of obtaining the guaranty of the Veterans Administration.

The plaintiff in the proceedings before the referee offered in evidence the record of the proceedings had in the federal court as establishing *prima facie* the guilt of the defendant. The defendant argued to the referee, as he does here, that he should not have been convicted in the federal court and offered proof before the referee to sustain his claim of innocence. Whether or not a *prima facie* case was made by plaintiff, we are satisfied that the record establishes misconduct on his part as was found by the referee.

We have given due consideration to the vigorous presentation of defendant's cause and have made careful study of his contention that the evidence does not support the referee's findings of fact. We find adequate support in the record for the findings of the referee with respect to both counts of the complaint. There has been misconduct, and we are to be concerned only with the question whether the recommendation of the referee should be adopted by us. It is our function to inquire whether a more severe penalty should be visited upon the defendant as is suggested by the Board of Bar Commissioners.

Three Milwaukee county circuit judges, and one former circuit judge testified on behalf of the defendant in somewhat

laudatory terms. Two Rabbis gave similar testimony. Eight attorneys, one of them an attorney investigator for the Milwaukee Real Estate Brokers' Board, gave testimony favorable to him. The referee stated as follows:

"His conduct before me has been above criticism and seemingly holds true in all his other appearances. He is highly respected in his community and in the courts of Milwaukee county, as testified to by individuals, lawyers, public officials, rabbis, and judges."

We may not treat his recommendation lightly. He was influenced, no doubt, as are we, by the character and standing of the persons who testified favorably for the defendant. It is obvious from his report that he was convinced that it has not been shown that defendant does not possess the essential character and qualifications to continue in the profession.

It is apparent that the referee did not conclude that the defendant is a person lacking in moral sense and appreciation of the relationship of attorney and client and should, therefore, not be permitted in the public interest to continue in the practice of law. *State v. Markey,* 259 Wis. 527, 49 N. W. (2d) 437.

We agree with him, however, that the acts of the defendant are subject to and deserving a reprimand. We believe, also, that the defendant should pay the costs of this proceeding.

It is ordered and adjudged that the defendant be required to pay the costs and expenses of these proceedings, including the fees of the referee, the official reporter, the clerk, and the costs of printing the plaintiff's appendix and brief; that he be suspended from the practice of law until he furnish to the court evidence of payment of the costs ordered to be paid by him.