Per Curiam.
Louis B. Aderman is a native of Milwaukee, Wisconsin, forty-seven years old, married, and the father of two children. He graduated from Milwaukee State *321 Teachers College in 1933, and from Marquette University Law School in 1937, with admittance to the Wisconsin bar in June, 1937, and has practiced in Milwaukee almost continually since that date. Although sometimes sharing office space with another attorney, he has always practiced alone. Prior to 1956, he was in general practice, as well as being active in the real-estate business.
In 1951, defendant was convicted in the United States district court for the Eastern district of Wisconsin of two federal felonies. The defendant’s conviction in the federal court gave rise to disbarment proceedings in this court, as a result of which defendant was found to have been guilty of misconduct. He was reprimanded and required to pay costs and expenses of the proceeding. State v. Aderman (1955). 270 Wis. 516, 71 N. W. (2d) 268.
In 1956, defendant became actively engaged in the practice of criminal law, and secured his first criminal case by reference from another attorney. Defendant’s criminal practice increased with extraordinary rapidity among people charged with violations of narcotics laws. By 1957, he had become one of Milwaukee’s busiest criminal lawyers in this area. In 1957, Mr. Aderman was appointed by the court to defend indigent persons in over 30 cases. He represented 67 different persons in municipal court during that year and appeared in municipal and district courts of Milwaukee literally hundreds of times.
The early fall of 1957, defendant was under suspicion in the eyes of some judges, the district attorney’s office, the police, and jail attendants. Defendant’s criminal business fell off sharply, and several of his clients discharged him in midstream. About this time some of his clients made statements to the police, district attorney’s office, and others, accusing defendant of some of the improper practices of which he is charged in the present action.
*322 Defendant’s criminal practice shrank almost as fast as it had grown, as a result. In February, 1958, he gave up his practice and left the state. In July of the same year, he returned to Milwaukee and once again established himself as a practicing attorney. It appears he regained some of his criminal practice upon his return, but the majority of his law work was in another field.
The amended complaint contains 13‘counts, some of them charging several offenses. In all, over 30 separate acts of wrongdoing are charged. These charges fall into three general categories: (1) Solicitation of clients; (2) encouragement of perjury and suppression of truth; and (3) improper attitude toward courts and other lawyers.
The defense consists of denials of all wrongdoing, attempts to impeach plaintiff’s witnesses, and a claim to a virtual conspiracy between police officers and plaintiff’s principal witnesses to eliminate defendant from practice in the criminal courts, where he contends he was a thorn in the flesh of the police by his zeal and success in defending those charged with crime. The record reveals that much testimony was taken in connection with the defendant’s attempt to show the conspiracy and police pressure which the defendant asserted to have existed. In this respect he was not wholly without reason for such belief. He tried to collect evidence on the basis of which he could support his charges. While certain of the police officers and members of the district attorney’s office did play some part in getting some persons who had dealt with defendant to give statements concerning the charges against him, nevertheless, the referee, the trier of the facts, found no credible evidence that they consciously or improperly induced or tried to induce such witnesses to testify falsely.
Plaintiff’s case rests largely on (a) the testimony of two police detectives, an assistant district attorney, and a deputy *323 sheriff as to conversations participated in by defendant which they overheard, and (b) testimony of 10 other persons as to statements made by defendant to them. All of these 10 witnesses had been convicted of criminal offenses, and most had served prison terms.
Many of the charges against the defendant were supported only by the testimony of persons frequently involved with the police who might have been motivated by a desire to gain favorable standing with the police. Most of the other charges rested wholly on testimony of police officers to conversations overheard by them, and recalled several months and even years later.
The amended complaint contained 13 separate counts. Count I relates to the defendant’s frequently, improperly, and unethically soliciting in person and causing others to solicit business on his behalf. This count specifically listed 10 separate counts of solicitation.
Count I.
“(a) That on or about the 13th day of September, 1957, the defendant requested one William Hudson Davis to solicit legal business for defendant.
“(b) That on or about the 13th day of September, 1957, the defendant requested one Thomas Pate to solicit legal business for defendant.
“(c) That in- November of 1957, defendant approached one J. W. Childs and asked that the said J. W. Childs retain him as his counsel.
“(d) That in the spring of 1957, the defendant requested one Anderson Griffin to solicit legal business for defendant.
“(e) That in the year 1957, the defendant requested one Gilbert Turner to solicit legal business for defendant.
“(f) That on the 15th day of November, 1957, the defendant solicited one William Palmer with the intention of inducing the said William Palmer to retain him.
*324 “(g) That in May of 1957, the defendant solicited one Roscoe Webb with the intention of inducing the said Roscoe Webb to retain him as his counsel.
“(h) That on or about the 15th day of February, 1957, the defendant solicited one Donald W. Spears to retain him as his counsel.
“(i) That in the spring of 1957, the defendant approached one Fred Githering and requested the said Fred Githering to solicit legal business for defendant.
“(j) That the defendant held interviews with the foregoing prisoners not warranted by personal relations; that he made repeated visits to said jail for the purpose of solicitation at all hours and many times in one day; that on his visits to the jail he would see as high as five prisoners; that defendant’s visits to the jail were far more than any other attorney and so frequent that a certain bench in said jail was designated as ‘Aderman’s office;’ that defendant did bring with him to the jail and distribute among the prisoners, pamphlets entitled ‘Denial of Human Rights in Criminal Cases,’ which pamphlets contained a collection of authorities on the denial of defendants’ rights in criminal matters, which books prominently displayed his authorship thereof and professional capacity.”
The record reveals that on many occasions defendant, Aderman, informed clients in the county jail that he would be glad to serve other prisoners who needed or wanted an attorney. He gave his clients confined in the county jail more than one of his cards. He also told these clients if other persons wanted to get in touch with him they should contact him. Aderman knew or should have known that the passing out of business cards in the county jail and in the bull pen was improper. Such acts by the defendant were a material factor in building up his criminal practice confined at the county jail.
There is no evidence that Aderman employed touters or promised or gave any payment or reward to anyone for praising or recommending him to potential clients or for *325 soliciting business for him. It further reveals that much of the activity of the defendant’s clients in recommending him to others was motivated by the belief that Aderman associated himself with the cause of the underdog and was a zealous and capable lawyer who used his professional skill to best protect his clients’ interests.
The fact that defendant was an able defense attorney is evident from the testimony of both Judge Hansen of the district court of Milwaukee, and Judge Steffes of the municipal court. While Judge Steffes at one time stated he suspected defendant of soliciting business from the prisoners in the jail, he testified that he could think of no occasion when defendant’s conduct in the actual presentation of matters in his court gave him reason to suspect that he was guilty of improper conduct as an attorney. Judge Hansen of the district court testified that Aderman had appeared before him in perhaps 150 cases, and “there never was any occasion for me to consider his presentation of a case or his conduct as a defense attorney improper.”
This court accepts the referee’s finding of fact that the plaintiff failed to prove any very serious case of direct solicitation of employment. Aderman’s remark to Childs that if he ever needed a good lawyer he should get in touch with Aderman (Count I (c) ), and the discussion with Webb about a possible retainer, at Webb’s invitation but with the knowledge that Webb was then represented by another attorney (Count I (g)) taken alone could be dismissed as inconsequential breach of professional ethics. The offer by Aderman to help William Palmer if he could pay $50 was more serious (Count I (f)), but considering the fact that there had been a previous conference on the subject of a retainer and the fact that Palmer was on his way to Waupun tends to mitigate this offense.
*326 The most-serious misconduct found in the field of solicitation is that Aderman frequently told his clients in the jail that if anyone else in jail wanted an attorney, he would be glad to handle their case. He also told his clients how such persons were to get in touch with him. That such persons should have someone on the outside call or write Aderman because the jail attendants were watching him and messages to him were not coming through the regular channels. On other occasions he also gave more than one of his business cards to his clients, in the hope they would pass them on to other prospective clients. (Count I (a), (b), (c), (e), and (i)0
While a single or infrequent instance on the part of a lawyer of telling a client he would be happy to serve friends of the client or the liberal distribution of business cards might not warrant action by this court, the instant case involved something more culpable. The record does indicate a deliberate attempt by the defendant to secure recommendations for the defendant’s employment. Collectively these incidents suggest that defendant was not conscious of the ethical precepts against solicitation and willing, when the occasion permitted, to conduct himself in a manner amounting to unprofessional conduct violating Canons 27 and 28 of the Canons of Professional Ethics. Canon 27 provides:
“It is unprofessional to solicit professional employment by circulars, advertisements, through touters or by personal communications,, or interviews not warranted by personal relations. ...
Canon 28 provides in part:
“It is disreputable to hunt up defects in titles or other causes of action and inform thereof in order to be employed to bring suit or collect judgment, or to breed litigation by seeking out those with claims for personal injuries or those *327 having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, . . . bring or influence the bringing of such cases to his office, or to remunerate policemen, court or prison officials, physicians, hospital attaches, or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick, and the injured, the ignorant, or others, to seek his professional services.”
The most-serious charges against the defendant relate to the subject of false testimony and suppression of evidence. While Counts II through IX of the complaint charge the defendant with subornation of perjury, the record indicates that only Counts II, III, IV, and VI were proved to the satisfaction of the referee by clear and satisfactory evidence. Accepting the referee’s findings, the aforenamed Counts are as follows:
Count II.
“That in the year 1957, the defendant, Louis B. Aderman, represented one William Davis, then charged with a violation of the Wisconsin Narcotics Law.
“That on or about the 13th day of September, 1957, at the Safety Building in the city of Milwaukee, Wisconsin, the defendant misled or attempted to mislead his client, William Davis, by telling him that he would see what he could do to keep Thurmon Wilson, Victor Alford, and Curtis Bowers, who were present at the time and place Davis was arrested, from testifying against Davis in connection with the criminal prosecution then pending against him, and further, by telling Davis that if he could not do that he would see what he could do about having said witnesses testify that they had seen nothing at the time the said Davis was arrested.
“That at the same time and place, defendant improperly advised, misled, and counseled his client, William Davis, by telling him that his case would not be heard by Judge Herbert J. Steffes, judge of the municipal court, Milwau *328 kee, Wisconsin, but that defendant would take his case across the street, meaning to the circuit court in the Milwaukee county courthouse, and further told Davis that it would be a breeze over there.”
Count III.
“That in the year 1957, Louis B. Aderman represented one Thomas Pate, then charged with a violation of the Wisconsin Narcotics Law.
“That on or about the 13th day of September, 1957, at the Safety Building in the city of Milwaukee, Wisconsin, the defendant misled, or attempted to mislead, his client, Thomas Pate, by telling him that he should have his brother, Charles Pate, keep Thurmon Wilson, Victor Alford, and Curtis Bowers, who were present at the time Pate was arrested, away from court as witnesses against the said Thomas Pate and William Davis, mentioned in Count II hereof, and further, that if his brother could not keep them away that he should influence them to say that they saw nothing at the time and place Pate and Davis were arrested, and that at the same time and place, defendant further told the said Thomas Pate that defendant would see what he could do to keep said Victor Alford, Thurmon Wilson, and Curtis Bowers from appearing in court, or if they did appear, to see what he could do to have them testify that they saw nothing at the time and place of the arrest of Thomas Pate and William Davis.”
Count IV.
“That the defendant, Louis B. Aderman, in connection with his representation of William Davis and Thomas Pate, who were arrested in the year 1957, at the city of Milwaukee, Wisconsin, and charged with illegal possession of heroin, did improperly suggest, counsel, and advocate an unjust and spurious defense in the following respect:
“That at the time the said Davis and Pate were arrested, Davis admitted to police officers that he owned the heroin which was involved; that on the 9th day of September, 1957, at the Safety Building in the city of Milwaukee, Wisconsin, *329 defendant was advised by William Davis that the heroin was owned by Davis and Pate; that, nevertheless, on said date defendant suggested to Davis and Pate that the heroin could have belonged to certain boys who were present at the time of the arrest of Pate and Davis; that at the trial of said matter, on the 7th day of November, 1957, in the municipal court, Milwaukee, Wisconsin, the defense offered was that the heroin involved was the property of one of the young men present when Davis and Pate were arrested.”
Count V.
“That defendant, Louis B. Aderman, in connection with his defense of William Davis and Thomas Pate, named in Counts II, III, and IV hereof, did attempt to persuade one Quinester Bentley Ramsey, to testify falsely at the then pending trial of Davis and Pate in the following respect:
“That defendant in late spring or early October of 1957, requested the said Quinester Bentley Ramsey to come to his office in the city of Milwaukee, Wisconsin, and that pursuant to such request she did visit the defendant at his office; that upon her arrival at defendant’s office, he attempted to persuade her to testify at the pending trial against Davis and Pate to the effect that Detectives Dennis Dayle, Milton Lange, and Robert Schneider, members of the vice squad of the Milwaukee police department, had made improper advances to her, and that the members of the vice squad were dishonest and that one or more members of the vice squad had had sexual relations with her; that defendant further told her that by so testifying she would help her ‘boy friend,’ William Davis.”
Count VI.
“That on or about the 19th day of December, 1957, at the city of Milwaukee, Wisconsin, the defendant then represented one Arthur Gibson, who was then under arrest and charged with the illegal use of heroin; that on or about said date, at the Safety Building in the city of Milwaukee, Wisconsin, the defendant told the said Arthur Gibson to testify falsely in connection with his own defense by stating that *330 he only used heroin in Chicago, Illinois; that, at the same time and place, defendant told the said Arthur Gibson that he could not be convicted for what he did in Chicago; that the said Arthur Gibson did, on said date, at the municipal court for Milwaukee county, Wisconsin, testify in his own defense that he had used heroin during the period charged in the information but that such use was in Chicago, Illinois.”
Count VII.
“That in the year 1957, the defendant represented one George McNeil, who was charged with a violation of the Wisconsin Narcotics Law; that during the last part of September, 1957, at the Milwaukee county jail, in Milwaukee, Wisconsin, the defendant conferred with one Karen Elizabeth Fox; that at said time and place Karen Elizabeth Fox told defendant that the said George McNeil was the owner of marijuana involved in the charge then pending against McNeil; that at a subsequent conference at said jail between defendant and Karen Elizabeth Fox, the defendant suggested that she testify falsely in behalf of George McNeil by stating that she did not know who was the owner of said marijuana, and at the same time and place, defendant told Karen Elizabeth Fox that because she was involved in serious trouble for the first time that she would get probation regardless of whether or not said marijuana was hers.”
Count VIII.
“That one Jeanette Davis was arrested in May of 1957, for possession and use of heroin; that at that time defendant represented one Anderson Griffin; that defendant visited the said Jeanette Davis in the Milwaukee county jail and told her that Anderson Griffin had admitted to defendant the ownership of certain narcotics and certain narcotics paraphernalia; that at the same time and place, defendant then stated to Jeanette Davis that if she would testify in behalf of Anderson Griffin that the narcotics paraphernalia and narcotics involved belonged to her that she would not have to serve a sentence because it would be her first offense.”
*331 Count IX.
“That in November, 1957, defendant represented one Robert Montgomery Johnson who was arrested November 9, 1957, and charged with a violation of the Uniform Narcotic and Drug Act; that defendant, on the 13th day of November, 1957, at the county jail in the city of Milwaukee, induced one J. W. Childs to write out a statement concerning the action against Robert Montgomery Johnson; that the defendant instructed Childs as to what to include therein; that the statement was false in the following respects: That Childs had been told by Detective Dennis Dayle that he would be released if he identified certain articles as the property of Robert Montgomery Johnson; that Childs had told Lieutenant Dayle that he did not know who owned the articles mentioned in the statement; that at the time defendant induced Childs to write said note, defendant stated that Childs should state that the note was Childs’ idea; that at the same time and place, Childs advised defendant that the property mentioned in said note belonged to Robert Montgomery Johnson; that although defendant knew said statement contained falsities, he offered the same evidence on the 9th day of December, 1957, in district court, branch No. 1, Milwaukee county, Wisconsin.
“That on or about the same time and at the same place, defendant attempted to induce the said J. W. Childs not to testify against Robert Montgomery Johnson and asked Childs to testify falsely that certain heroin and certain finger-stalls were the property of Childs and not that of Johnson.
“That on October 29, 1957, Robert Montgomery Johnson was arrested by the Milwaukee police department on a charge of vagrancy and placed in the Milwaukee county jail; that he was represented at that time by defendant; that at that time defendant called J. W. Childs and asked him to meet defendant at the Milwaukee county courthouse; that at said time and place defendant asked Childs to assist Robert Montgomery Johnson by testifying falsely that Johnson was related to Childs as a cousin and further ,that he lived with Childs.”
*332 As the record states, on August 13, 1957, William Davis and Thomas Pate were arrested in an apartment, with three eighteen-year-old boys named Alford, Bowers, and Wilson. Heroin and paraphernalia for using it were found in the apartment at the time of the arrest, and Davis was caught in the act of injecting heroin into his arm. Davis and Pate were charged with possession and use of narcotics. Aderman was retained by both men as attorney. Approximately one month after their arrest and confinement the defendant, prior to the scheduled preliminary hearing, conferred with Davis and Pate individually on a stair landing just off the bull-pen area of the county jail, a few feet outside the open door of the courtroom. During the conference with Davis, Aderman stated that he understood Pate’s brother, Charles, was a friend of the eighteen-year-old boys, and that he would see Thomas Pate about having Charles Pate contact these boys and see what could be done about keeping them out of court or having them testify that they saw nothing. (Count II.)
Immediately after Aderman conferred with Davis, he requested and was granted an interview with his other client, Thomas Pate. This conference took place at the same location, and Aderman told Pate in substance to have his brother Charles contact the eighteen-year-old boys and have them stay away from court or testify that they saw nothing at the time of the arrest. (Count III.) Aderman told both Davis and Pate during the course of the interviews that each would have to stop thinking about testifying against each other, because it would be a conflict of interest, and he, Aderman, could not defend both men.
There is no evidence in the record that Aderman, or Charles Pate, ever contacted the eighteen-year-old boys, or that any effort was made to persuade them not to testify or to testify falsely. There is also no evidence that Aderman *333 asked Charles Pate, brother of defendant’s client, to take steps to influence their testimony or keep the boys away from court.
While there is no evidence that any attempt was actually made to tamper with the witnesses in question, defendant’s suggestion of such a course of conduct to his clients was reprehensible, and his instructions to Pate to have his brother contact the boys was an overt act toward suppression of evidence or subornation of perjury.
In the same case, Aderman was told by Davis and Pate that heroin in question belonged to both of them. He then said to his clients that the eighteen-year-old boys were right there and it could have been theirs (Count IV). At the trial two months later Davis testified that heroin was brought to the party by one of the eighteen-year-old boys, and Pate testified that neither he nor Davis had possessed the heroin or brought it to the party. The testimony is sufficiently clear so as to establish an inference that Aderman suggested the giving of testimony which he knew or should have known was false.
Count VI states that Aderman told his client, Arthur Gibson, to testify falsely in connection with his own defense by stating that he used heroin in Chicago, Illinois, not in Wisconsin, and consequently could not be convicted for what he did in Chicago.
The conversation with reference to the above (Count VI), took place at the counsel table between the defendant and his client in Milwaukee municipal court. The conversation was heard by three persons, an assistant district attorney and two Milwaukee police detectives. They testified, stating the substance of the conversation as follows: Aderman asked Gibson if he had admitted to the police that he had been using heroin. Gibson said he had. Aderman then asked whether Gibson *334 had told them that he used it in Milwaukee. Again, Gibson answered in the affirmative. Aderman then asked his client if he had been in Chicago during this time, and again Gibson assented. The defendant then explained to Gibson that he could not be convicted in Milwaukee for what he did in Chicago, so the thing to say when he testified would be that he used it in Chicago and nothing would happen. Gibson did so testify.
The Canons of Professional Ethics of the American Bar Association, which are the basic standards governing the practice of law in this state (Rule 9, State Bar Rules) contain the following:
Canon 15. “. . . The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane. He must obey his own conscience and not that of his client.”
Canon 16. “A lawyer should use his best efforts to restrain and to prevent his clients from doing those things which the lawyer himself ought not to do, particularly with reference to their conduct toward courts, judicial officers, jurors, witnesses, and suitors. . . .”
Canon 31. “. . . The responsibility for advising as to questionable transactions, for bringing questionable suits, for urging questionable defenses, is the lawyer’s responsibility. He cannot escape it by urging as an excuse that he is only following his client’s instructions.”
Also State v. Koberstein (1941), 238 Wis. 418, 420, 298 N. W. 205, expresses the attitude of this court where one is accused of subornation of perjury.
“One accused of subornation of perjury cannot shield himself with the subjective defense that he had no knowledge of the falsity of the testimony when as a matter of fact the evidence objectively gave him good reason to believe that such testimony was false.”
*335 While there is no evidence that Aderman knew of his own knowledge that Gibson’s testimony was false, and no evidence that Gibson planned to give false testimony to establish a defense, it is evident from the record that Aderman encouraged his client to give material testimony which he, the defendant, had good reason to believe was false.
Charges in the amended complaint that defendant maintained an improper attitude toward the courts and other lawyers were not proved to the satisfaction of the referee or to this court. Testimony disclosed an attitude on the part of the defendant toward the filing of affidavits of prejudice, which merits criticism. It is apparent that he filed or counseled the filing of such affidavits almost as a matter of course, regardless of whether there existed'a good reason to believe that the accused could not have a fair trial because of prejudice of the judge against the accused. The record did disclose defendant was faithful to the interests of his clients as he understood them. The zeal and vigor with which Mr. Aderman defended the interests of his clients perhaps caused him to hurdle some ethical boundaries on occasion to the discomfort of the police and prosecuting attorneys.
The testimony and record in this case point to certain patterns of conduct on the part of the defendant. Where a single disreputable witness testifies to' an act on the part of the defendant which the latter denies, the court’s inclination is to hold that uncorroborated testimony against the defendant does not meet the requirements of clear and' satisfactory evidence of wrongdoing, or overcome the presumption of innocence. However, where several different witnesses, no matter how disreputable, testify to so many and distinct instances of conduct of the same pattern on the part of the defendant, it is not so easy to dismiss the testimony. In the *336 present case, the numerous charges against the defendant have more weight collectively than any of them considered individually, and obligates this court to consider the general pattern of conduct which evolves from each count to determine the defendant’s guilt or innocence.
The testimony in this case indicates and points to a certainty that the defendant has followed a certain pattern in his conduct as a trial lawyer which merits disciplinary action.
This court is of the opinion that a suspension will be sufficient to impress upon the defendant that conduct as exposed and proved during the hearing will not be tolerated by fellow attorneys or the courts of this state. It should be made equally clear to the defendant that if he be reinstated that a finding of further serious misconduct will inevitably result in permanent disbarment. The public interest requires a suspension of two years and payment of $3,000 toward costs of the proceeding as a condition of reinstatement payable any time prior to the defendant’s petition for reinstatement.
It is, therefore, ordered and adjudged that the license of the defendant, Louis B. Aderman, to practice law be suspended for a period of two years from the date of entry of this order, and for such period thereafter as shall expire before his license is restored. That restoration of defendant’s license be conditioned upon payment of $3,000 toward the costs of this proceeding and compliance with sec. 6, Rule 10, State Bar Rules, and satisfactory proof that during the term of suspension, defendant has not practiced law in this state and has not held himself out as licensed to practice law as an attorney in this state.